### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

| | |
|---|---|
| DAVID WIDENER,                    ) | |
|    Plaintiff,      ) | |
|                                   ) | |
| v.                                ) | CIVIL ACTION NO. 2:13-20648 |
|                                   ) | |
| CAROLYN W. COLVIN,                ) | |
| Acting Commissioner of Social Security, ) | |
|    Defendant.      ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered April 12, 2013 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 10-12 and 13.)

The Plaintiff, David Widener (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on June 29, 2010 (protective filing date), alleging disability as of July 1, 2007, due to arthritis in the spine, knees, and hands and spurs in the lower back.[1] (Tr. at 17, 209-10, 211-15, 236,

---

[1] Claimant filed prior applications for DIB and SSI on April 28, 2008, alleging disability on July 30, 2007. (Tr. at 17.) His claim was denied initially and upon reconsideration. (*Id.*) On November 8, 2008, Claimant requested a hearing before an ALJ. (*Id.*) A hearing was held on March 3, 2010, and by decision dated March 5, 2010, the ALJ determined that Claimant was not entitled to benefits. (*Id.*) The decision became the final decision of the Commissioner on August 4, 2011, when the Appeals Council denied Claimant's request for review. (*Id.*) Claimant sought judicial review of the administrative decision on September 28, 2011, and by Memorandum Opinion and Order dated September 24, 2012, the District Court affirmed the Commissioner's decision. *Widener v. Colvin*, Civil Action No. 2:11-00670 (S.D.W.Va. Sept. 24, 2012)(J. Copenhaver). Accordingly,

240.) The claims were denied initially and upon reconsideration. (Tr. at 134-37, 151-53, 159-61, 162-64.) On November 11, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 165-66.) A hearing was held on February 23, 2012, before the Honorable John W. Rolph. (Tr. at 54-115.) By decision dated March 6, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 17-32.) The ALJ's decision became the final decision of the Commissioner on June 5, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on July 18, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the

---

pursuant to the principles of *res judicata*, the relevant period to Plaintiff's instant appeal is from March 5, 2010, the date of the prior ALJ's decision, through March 6, 2012, the date of the current ALJ's decision.

2

claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent

3

to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, March 6, 2010. (Tr. at 20, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease of the lumbar spine with pain; obesity; Type II diabetes mellitus; generalized osteoarthritis/arthralgias; and borderline intellectual functioning," which were severe impairments. (Tr. at 20, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

5

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is able to lift up to twenty pounds occasionally, lift and carry up to ten pounds frequently in light work as defined by the regulations. He may occasionally climb ramps and stairs, bend, balance, stoop, kneel, crouch, and crawl, but may never climb ladders, ropes or scaffolds. He must avoid concentrated exposure to extreme cold, vibrations, and irritants such as fumes, odors, dust, gases, chemicals and poorly ventilated spaces. He must avoid all exposure to heat and hazards such as moving machinery and unsecured heights. He is fully capable of learning, remembering and performing simple, routine and repetitive work tasks involving simple work instructions.

(Tr. at 22-23, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 30, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a parking lot attendant, gatekeeper, and garment folder at the light level of exertion and a surveillance systems monitor and a price marker, at the sedentary level of exertion. (Tr. at 31, Finding No. 10.) On this basis, benefits were denied. (Tr. at 32, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on January 30, 1966, and was 46 years old at the time of the administrative hearing, February 23, 2012. (Tr. at 30, 209, 211.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 30, 239, 241.) In the past, he worked as a butcher, truck driver, and warehouse worker. (Tr. at 30, 241-42.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and summarizes it herein in relation to Claimant's arguments.

Claimant treated with Angela Carter, FNP, at Big Otter Clinic, from April 22, 2010, through May 5, 2011. (Tr. at 353-417.) He treated primarily for his diabetes (Tr. at 363-64, 370-71, 384-85.), however, treatment notes reflect that Ms. Carter saw him on occasion for pink eye (Tr. at 388-89.), complaints of cough and runny nose (Tr. at 380-83, 386.), and pleurisy. (Tr. at 377-78.) The medical notes indicated "osteoarthrosis, generalized" as one of Claimant's active problems on nine occasions, but the notes were not accompanied by any subjective complaints or findings. (Tr. at 353, 355, 358, 363, 370, 377, 384, 388, 401.) On November 15, 2010, Ms. Carter included "Osteosarthrosis, Generalized, Involving Multiple Sites" as a diagnosis, but neither the physical exam nor the subjective reports indicated any findings or symptoms. (Tr. at 363-64.) The only treatment was a refill of his Naproxen 500mg. (Tr. at 364.)

The x-ray of Claimant's right knee, ordered by Ms. Carter on February 11, 2010, revealed only mild ossification of the tibial tubercle, but otherwise was normal. (Tr. at 403.) The x-ray of his

left knee revealed no osseous abnormality. (Id.)

On March 20, 2011, Claimant presented to the emergency room at Braxton County Memorial Hospital when he fell in his driveway when his knee went out and he struck his right anterior chest on the porch. (Tr. at 338.) There was no indication of rib fracture or bony lesions. (Tr. at 342.)

On December 8, 2011, Claimant reported a month history of tingling and numbness of his fingers of his right hand that had worsened. (Tr. at 435-36.) He also reported continued back pain. (Tr. at 435.) Ms. Carter diagnosed numbness and back pain and ordered an EMG and x-ray of his entire spine. (Tr. at 436.)

An x-ray of Claimant's cervical spine on December 12, 2011, revealed mild joint osteophytosis consistent with degenerative joint disease. (Tr. at 524.) The x-ray of his thoracic spine indicated multifocal anterior osteophytosis with diffuse anterior ossification of the interior and longitudinal ligament that was highly compatible with DISH.[3] (Id.) Finally, the x-ray of Claimant's lumbar spine demonstrated facet joint arthrosis at the L4-L5 and L5-S1 facet joints. (Id.) There was slight forward positioning of L4 on L5 that was likely degenerative in nature. (Id.)

Claimant was examined by Dr. Joseph Snead, M.D., on January 12, 2012, for complaints of bilateral knee pain. (Tr. at 463-64.) Claimant reported that the pain was moderate to severe in nature, changed in the weather, had occasional giving way sensation, had persisted for more than six months, and had no swelling or locking sensation. (Tr. at 463.) On examination, Dr. Snead noted bilateral medial joint line tenderness. (Tr. at 464.) Nevertheless, Claimant had full range of motion, intact strength, and no evidence of laxity. (Id.) He reviewed prior x-rays, which revealed mild

---

[3] Diffuse idiopathic skeletal hyperostosis ("DISH") is a calcification or a bony hardening of ligaments in areas that attach to the spine. http://www.mayoclinic.org/diseases-conditions/diffuse-idiopathic-skeletal-hyperostosis/basics/definition/con-20024713. DISH, also known as Forestier's disease, typically is characterized by mild to moderate pain and stiffness in the upper back, neck, or lower back. *Id.* Other areas affected include the shoulders, elbows, knees, and heels. *Id.*

degenerative joint disease, and recommended a cortisone shot which Claimant refused. (Id.) Dr. Snead gave Claimant samples of Celebrex. (Id.)

Claimant was referred to Dr. David L. Soulsby, M.D., at the Orthoclinic on January 24, 2012, by Ms. Carter, for complaints of low back pain and pain between the shoulder blades that had persisted for twelve years. (Tr. at 465.) Claimant reported that the pain was worse in his lower back and he had shooting pains primarily down his right leg. (Id.) He reported pain in his shoulders with overhead extension and pain down his right arm and first three fingers with numbness and tingling for about 80% of the day. (Id.) Claimant also reported morning stiffness that lasted 20 minutes or longer that was not relieved with Naproxen. (Id.) Dr. Soulsby noted on physical exam, tenderness about the T-4 through T-5 area with pain that was worse with overhead extension and palpation. (Id.) He also noted lower lumbar pain with palpation and difficulty with forward flexion and rotation. (Id.) He assessed possible ankylosing spondylosis, low back pain, and thoracic pain. (Id.) Dr. Soulsby referred Claimant for physical therapy for strengthening and range of motion, prescribed Plaquenil 200mg, and continued him on Celebrex. (Id.)

On February 15, 2012, Claimant had an x-ray of his right shoulder for complaints of pain radiating into his right arm, which was normal. (Tr. at 536.)

*Opinion Evidence*:

On September 7, 2010, Dr. Miraflor G. Khorshad, M.D., conducted a consultative examination. (Tr. at 310-16.) Claimant reported a history of lumbar pain since 1994, that had worsened since 2007. (Tr. at 310, 312-13.) He described the pain as constant in nature that was exacerbated on mowing, bending, and squatting. (Tr. at 313.) Claimant further reported throbbing hand and knee pain that was made worse when the weather was damp and that was made better temporarily with Naproxen. (Tr. at 310, 313.) He also reported weakness of grip strength and neck

9

and shoulder pain. (Tr. at 311.) Dr. Khorshad observed that Claimant's gait was normal and that he walked without assistive device and that he was able to get on and off the exam table, but he was unable to heel and toe walk due to back pain and had difficulty sitting and squatting. (Id.) Claimant had no swelling of the joints of his upper and lower extremities, and he had normal range of motion therein. (Tr. at 312, 314-15.) He was able to make a fist and fully extend his hand, he had normal fine manipulation, and 3/5 upper extremity strength and grip strength. (Tr. at 314.) Lower extremity strength was 4/5. (Tr. at 315.) Dr. Khorshad diagnosed degenerative disc disease, indigestion secondary to non-steroidal anti-inflammatory drugs, and tinea versicolor. (Tr. at 313.)

On September 21, 2010, Dr. Uma Reddy, M.D., a state agency physician, completed a form Physical RFC Assessment, on which she opined that Claimant was capable of performing medium exertional level work, with unlimited ability to push and pull, and occasional postural limitations. (Tr. at 317-25.) She opined that Claimant should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, vibration, and poor ventilation, and avoid even moderate exposure to extreme heat and hazards. (Tr. at 321.) Dr. Reddy noted that Claimant took medications for his medical conditions but was not taking any significant pain medications. (Tr. at 322.) She opined that Claimant was able to do some physical activities but seemed to exaggerate his activities of daily living. (Id.) Dr. Reddy noted Claimant's activities to have included talking on the phone, watching television, performing personal care, preparing sandwiches and frozen dinners, performing indoor and outdoor chores, driving, and walking ten to twenty feet and then resting five to ten minutes. (Tr. at 324.)

Dr. Fulvio R. Franyutti, M.D., a state agency physician, completed a form Physical RFC Assessment on November 4, 2010, on which he noted that Claimant failed either to return the updated forms or return Dr. Franyutti's calls. (Tr. at 326-34.) The evidence therefore, was

insufficient for Dr. Franyutti to render an assessment. (Tr. at 333.)

On November 11, 2010, Angela Carter, a Nurse Practitioner, completed a form for the West Virginia Department of Health and Human Resources ("WV DHHR") for Claimant to obtain a medical card. (Tr. at 397-99.) Ms. Carter noted that Claimant was disabled due to back and knee pain and that he had back pain between the shoulders and in the low back. (Tr. at 397-98.) She noted that Claimant's major diagnoses were diabetes type II, uncontrolled; hyperlipidemia; back pain; and degenerative disc disease. (Tr. at 398.) She indicated a minor diagnosis as obesity. (Id.) Ms. Carter opined that Claimant was unable to perform his past work as a butcher on a full-time basis because he was unable to lift the meat. (Id.) She further opined that he was unable to perform any other full time work because he "can't stand long periods or lift." (Id.)

Ms. Carter completed a further form for the WV DHHR on January 27, 2012. (Tr. at 466-68.) Claimant reported that he was unable to drive the truck for work because he was on insulin and due to back and knee pain. (Tr. at 466.) Ms. Carter indicated that Claimant had uncontrolled diabetes, depression, and osteoarthritis of multiple sites, with widespread pain in his joints, back, knees, and feet. (Tr. at 467.) She indicated that his major diagnoses were diabetes type II uncontrolled, osteoarthritis, and hyperlipidemia and his minor diagnoses were depression and gastroesophageal disease. (Id.) Ms. Carter opined that Claimant was unable to perform his prior work because he was unable to drive a truck because he was on insulin and was unable to perform other work because he needed to see multiple specialists. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing his RFC because he failed to include limitations resulting from

11

his upper spine, shoulder, and extremities. (Document Nos. 10-12 at 6-10.) Claimant first notes that the objective evidence indicated that his arthritic conditions had worsened, particularly at the neck and upper back. (Id. at 7-8.) He alleges that the ALJ erred in failing to acknowledge that he had DISH. (Id. at 8.) Claimant next notes that the ALJ failed to acknowledge his subjective reports of pain and other symptoms. (Id. at 8-10.) He reports that he complained of aching, cramping, pain, and difficulty in his hands, including gripping and reaching. (Id. at 8.) He had reduced upper extremity strength and reduced grip strength, and numbness and tingling of the fingers of his right hand. (Id. at 9.) He reported morning stiffness in excess of twenty minutes. (Id.) Additionally, he had reduced rotation of the neck and constant pain in his neck. (Id.) Finally, Claimant asserts that the ALJ ignored the testimony of the VE, ruling out working on the basis of neck positioning and reaching limitations. (Id. at 12.)

In response, the Commissioner asserts that the ALJ's RFC assessment is supported by substantial evidence. (Document No. 13 at 9-14.) The Commissioner first asserts that the ALJ's RFC assessment is supported by the objective medical evidence, including the knee, spine, and shoulder x-rays and Dr. Khorshad's examination notes. (Id. at 10-11.) The Commissioner asserts that although the x-ray of Claimant's spine suggested that it was compatible with DISH, he never was diagnosed with DISH. (Id. at 10, 13-14.) The Commissioner next asserts that Claimant's conservative treatment supports the ALJ's RFC assessment. (Id. at 11-12.) She notes that Claimant's treatment notes with Ms. Carter fail to reflect any complaints of back or shoulder pain and reflect only treatment by Naproxen. (Id. at 11.) Furthermore, she notes that Claimant refused a cortisone shot for knee pain as recommended by Dr. Snead. (Id. at 11-12.) The Commissioner notes that Claimant advised Dr. Soulsby of increased shoulder and back pain with overhead extension but Dr.

Soulsby failed to acknowledge any significant limitations resulting therefrom and recommended only physical therapy. (Id. at 12.) The Commissioner next asserts that the ALJ's RFC assessment is supported by Claimant's activities of daily living, which consisted of driving his riding lawn mower for three hours every two weeks, doing laundry and dishes, preparing meals, shopping, caring for his own personal needs, and driving two and one half hours to one of his examinations. (Id.) Finally, the Commissioner notes that none of the opinion providers opined that Claimant was disabled. (Id. at 13.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in relying on the VE's testimony that he was capable of performing the job as surveillance system operator. (Document Nos. 10-12 at 12-15.) Claimant asserts that the ALJ's limitation of unskilled work is inconsistent with the job of surveillance system operator because this job requires a maximum reasoning level of 3. (Id.)

In response, the Commissioner asserts that Claimant's past relevant work as a butcher and truck driver, required a maximum reasoning level of 3, which is the same reasoning level required for the job of surveillance monitor. (Document No. 13 at 14.) She asserts that other districts have found that such reasoning level requires the completion of the seventh or eighth grade, which Claimant did, while other courts have concluded that it requires a limitation to simple, routine tasks or unskilled work. (Id. at 15-16.) The Commissioner asserts, therefore, that the ALJ properly relied on the VE's testimony in finding that Claimant was capable of performing the job of surveillance monitor operator. (Id.) Alternatively, the Commissioner asserts that the VE identified four other jobs that had lower reasoning levels that Claimant could perform and that existed in significant numbers in the national economy. (Id.) Accordingly, the Commissioner contends that the ALJ's decision

13

should be affirmed. (Id. at 16.)

Analysis.

1. RFC Assessment.

Claimant alleges that the ALJ erred in assessing his RFC. (Document Nos. 10-12 at 6-10.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2012). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)."

Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As stated above, the ALJ found that Claimant was capable of performing light exertional level work with occasional postural limitations and the exception that he never climb ladders, ropes, or scaffolds. (Tr. at 23.) The ALJ assessed environmental limitations and restrictions to accommodate Claimant's mental impairments. (Tr. at 24.) As the ALJ found, despite Claimant's complaints of hand, arm, shoulder, and neck pain, Dr. Khorshad found that he was capable of making a fist and fully extending his fist and had slightly reduced upper extremity and grip strength. (Tr. at 25, 314-15.) The x-ray of his right shoulder was normal. (Tr. at 25, 536.) Furthermore, he primarily treated with Ms. Carter and she did not indicate any complaints or limitations resulting from his hand, arm, shoulder, or neck. (Tr. at 28-30.) Regarding his back, the x-rays indicated at most mild impairment and a suggestion of DISH. (Tr. at 25, 524.) As the Commissioner notes, Claimant never was diagnosed with DISH and a diagnosis itself does not equate to disability. Dr. Khorshad noted that Claimant had full range of motion of his spine, and despite reports of increased pain in his back and shoulder to Dr. Soulsby, there were no limitations assessed by Dr. Soulsby. (Tr. at 25-26, 310-16, 465.) Regarding Claimant's knees, the x-rays revealed only degenerative changes. (Tr. at 25.) Dr. Snead acknowledged Claimant's reports of moderate to severe pain but noted full range of motion on exam, as well as intact strength. (Tr. at 25-26, 463-64.) Finally, the ALJ acknowledged that Claimant minimized his activities of daily living at times. On his Function Report, dated July 27, 2010, Claimant reported that he did laundry and dishes, drove the riding lawn mower for three hours every two to three weeks, drove a car and was able to go out alone, paid bills, managed a checkbook and savings account, counted change, watched television and talked on the phone, went to his

parents' house twice a week, and cared for his personal needs. (Tr. at 251-58.)

In view of the foregoing, the undersigned finds that the ALJ properly found that Claimant was not as limited as he alleged and that the ALJ's RFC assessment is supported by the substantial evidence of record.

2. VE Testimony.

Claimant also alleges that the ALJ erred in relying on the VE testimony that Claimant was capable of performing the job of surveillance system operator. (Document Nos. 10-12 at 12-15.) To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The VE identified three light jobs and two sedentary jobs which Claimant was capable of performing. (Tr. at 31, 105-06.) As the Claimant points out, the job of surveillance system monitor, Dictionary of Occupational Titles ("DOT"), Occupational Code 379.367-010, requires a "Reasoning" level of 3. 1991 WL 673244. Claimant solely argues that this reasoning level exceeds his intellectual level, as evidenced by IQ scores, educational records, and prior work records. The

17

four other jobs identified by the ALJ however, have reasoning levels that do not exceed levels 1 or 2. The parking lot attendant job, <u>DOT</u> Occupational Code 915.473-010, 1991 WL 687865, and the gatekeeper job, <u>DOT</u> Occupational Code 372.667-010, 1991 WL 673094, have Reasoning Levels of 2. The jobs of garment folder, <u>DOT</u> Occupational Code 789.687-066, 1991 WL 681266, and price marker, <u>DOT</u> Occupational Code 737.587-010, 1991 WL 680029, have Reasoning Levels of 1. The ALJ indicated that these jobs exist in the national and regional economies in significant numbers. Accordingly, the undersigned finds that because Claimant challenges only the reasoning level of the surveillance system operator job and because the ALJ identified four other jobs with a lesser reasoning level that Claimant is capable of performing, any error the ALJ may have committed is harmless. The undersigned does not address the substance of Claimant's argument and finds that there are jobs in significant numbers that the VE identified that Claimant can perform. Accordingly, the undersigned finds that the ALJ's step five decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10-12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then

fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 22, 2014.

R. Clarke VanDervort
United States Magistrate Judge